Filed 6/18/13  P. v. Enciso CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MIGUEL ANGEL ENCISO,<br><br>    Defendant and Appellant. | F064244<br><br>(Super. Ct. No. VCF238907A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Gerald F. Sevier, Judge.

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Following his conviction for first degree murder, Miguel Angel Enciso appeals on the following bases:  First, defendant contends the evidence is insufficient to support first

degree murder based upon lying in wait because there is a lack of evidence of watchful waiting or surprise attack. Second, defendant asserts the trial court violated the hearsay rule and defendant's right to confrontation by permitting evidence that his girlfriend had a tattoo bearing his name, accompanied by angel wings, because the tattoo amounts to nonverbal conduct intended as a substitute for verbal expression. Third, defendant maintains the prosecutor committed misconduct by referencing the tattoo and calling defendant the "angel of death" because the comments amounted to improper denigration. Fourth, defendant contends the prosecutor committed repeated instances of misconduct during cross-examination of defendant, that the admonishments given were inadequate, and that his motion for mistrial should have been granted on this basis. Lastly, defendant asserts that because there is no jury instruction regarding self-defense and its applicability to lying-in-wait murder, the jury instructions given, coupled with misstatements of the law by the prosecutor during closing argument, amount to instructional error as the jury was led to believe complete and imperfect self-defense were unavailable to defendant. We disagree with defendant and affirm the judgment in its entirety.

## PROCEDURAL HISTORY

In an information[1] filed December 15, 2010, the Tulare County District Attorney charged defendant with one count of murder. (Pen. Code,[2] § 187, subd. (a).) It was further alleged the murder was committed during the commission of a burglary and that defendant intentionally killed the victim while lying-in-wait. (§ 190.2. subd. (a)(15), (17).)

On February 22, 2011, defendant pled not guilty and denied the allegations.

Before trial, the People's motion to amend the information to strike the lying-in-wait special-circumstance allegation was granted. (§ 190.2, subd. (a)(15).)

---

[1]Codefendant Flora Mayra Perez was also charged, but was to be tried separately after the trial court granted the People's severance motion on March 10, 2011.

[2]All further statutory references are to the Penal Code unless otherwise indicated.

2.

Following a jury trial, defendant was found guilty of first degree murder. The jury found the felony-murder special allegation not true. (§ 190.2, subd. (a)(17).)

Thereafter, on January 11, 2012, defendant was sentenced to an indeterminate term of 25 years to life.

A timely notice of appeal was filed January 13, 2012.

## FACTS

On June 29, 2010, farm workers in the area of Manning and Hill Avenues in Fresno County discovered a burned body in an orchard. Near the body, officers and investigators observed tire and shoe tracks, a gas cap, and a gas can.

A bar code found on the gas can led investigators to the Dinuba Wal-Mart. With the assistance of Wal-Mart personnel, the bar code was then matched to a specific transaction. More particularly, the gas can and other items were purchased at 11:01 p.m. on June 28, 2010, for a total of $91.82; the items were paid for with a $100 bill. Other items purchased included latex gloves, trash bags, Clorox wipes, Febreze, and towels.

Wal-Mart video footage associated with the transaction identified two suspects, a man and a woman. The two appear in seven video clips taken while they shopped in the store. The suspects were later identified as defendant and his girlfriend Flora Mayra Perez.

Meanwhile, Estevan Dominguez became concerned about the whereabouts of his nephew, Jose Dominguez. Jose had been at Estevan's home until about 10:00 p.m. on June 28, 2010. The two planned to meet at 5:00 a.m. the next morning so that Jose could work with him in the fields. Before leaving his uncle's home, Jose asked to borrow $300. Estevan gave Jose five $100 bills.

Jose did not show the next morning. Estevan tried calling Jose, but there was no answer. After work, Estevan drove to Jose's home, a trailer located in Orosi. The doors were open and no one was home. Estevan noticed that two of Jose's vehicles were missing, including the Nissan Frontier Jose had been driving the night before and a Nissan Sentra. Estevan returned to his own home and called Jose's brother.

3.

Investigators learned of the missing person report on the afternoon of July 1, 2010. The picture of the missing person resembled that of the individual found in the orchard. Estevan and Lucio Dominguez identified the body as that of Jose Dominguez. Subsequent DNA analysis confirmed the body was that of Jose Dominguez.

Investigators following up on the missing person report responded to Jose's residence. The trailer was unlocked and no one was present. They found a latex glove in a bedroom, a bag containing plastic 55-gallon trash bags was found on a couch in the living room, and an orange extension cord in another bedroom. They found coins on the floor in the hallway, but no weapons or ammunition were found. Items belonging to Perez were also found, including a prepaid phone card, prescription medication, mail, and photographs. There were no signs of forced entry, nor did it appear anyone had entered the trailer through a window.

On July 2, 2010, at about 12:15 a.m., investigators went to Perez's home in Goshen and searched it. Perez and her two minor children shared the home with defendant. The investigators found a number of items that matched the items purchased at the Dinuba Wal-Mart, including Clorox wipes, Febreze, and towels. They also found a MasterCard credit card and a Bank of the West check card in the victim's name, the title to a 1994 Honda in the names of Perez and the victim, and a pair of sunglasses. Drying on the fence outside were articles of clothing similar to the clothing worn by defendant and Perez while shopping at the Dinuba Wal-Mart a few days earlier.

Jose's Nissan Sentra was found in Visalia on July 7, 2010. Tire tread impressions found in the orchard were consistent with the tire pattern on Jose's Sentra. Additionally, Perez's fingerprint was recovered from the gas cap located in the orchard. Video footage was obtained from Bank of the West in Visalia. It showed Perez wearing sunglasses and utilizing Jose's check card to withdraw $180 from his account on June 30, 2010, at 10:07 a.m.

Jose Bacilio Leon and Claudia Bernal lived together in Visalia; both knew defendant as "Carlos." Leon received several text messages from defendant beginning

4.

June 29, 2010, asking if he would be interested in buying a car for $800. On July 1, 2010, defendant, accompanied by a woman, brought a white Nissan Sentra to the Leon/Bernal home. Although Leon told defendant he could not afford to buy the car, defendant asked to leave the car there because he had nowhere to park it as he was in the process of moving. The Nissan Frontier owned by Jose was also later located in Visalia, on July 14, 2010. Maria Villareal testified that defendant, known to her as "Carlos," brought the truck to her home in July 2010 so that her husband could take care of it.

An autopsy revealed that Jose was dead prior to being set on fire, but a cause of death could not be determined. No drugs or alcohol were detected. There was no disease or defect, nor were there any obvious signs of injury; the deceased had been otherwise healthy. The pathologist later learned that Jose had been choked to death. He testified his autopsy findings were consistent with an individual who had been choked by an arm around the neck, and thus, in his opinion, the cause of Jose's death was homicidal asphyxia.

### Defendant's Testimony

**Direct Examination**

Defendant recalled being arrested on a Thursday night and being taken to Fresno to be interviewed by detectives. He admitted lying to the detectives initially about his activities earlier that week, but did eventually tell the truth.

One morning Perez woke him inquiring whether they had parked the car on the street the night before. Defendant confirmed they had, but Perez indicated the car was missing.[3] Also missing was Perez's purse that had been left inside the car; the purse contained a sum of cash as defendant had been paid a few days prior. Jose was Perez's ex-husband. Perez and defendant assumed Jose had taken the vehicle. Although defendant told Perez to call the police to report the car stolen, Perez indicated that title to

---

[3]The missing vehicle was found on June 28, 2010, at about 2:00 a.m. in Lindsay by the California Highway Patrol. The vehicle had been burned and was a total loss.

the car was in both her name and Jose's name and thus it would not be considered stolen by Jose. Instead, because she was angry, Perez wanted to go to Jose's to beat him up and get the car. The vehicle was their only form of transportation and defendant used it to get to work. Defendant elected to accompany Perez to make sure she was okay and to back her up. He thought they would find the car, get it back, and then leave. Defendant admitted that when he told the detectives that he was going to fight Jose, he was telling the truth.

Defendant decided to accompany Perez because he knew Jose to be violent. Perez told defendant that Jose frequently hit her, and he knew Jose had been jailed for domestic violence. Two to three weeks before this incident, Jose had assaulted defendant with a steel bar, after having crashed his own car into Perez's friend's car. Jose also broke the rear window of defendant's Mustang.[4]

After Perez could not find a ride to Jose's, defendant called his friend "Funda" to give them a ride. When they arrived at Jose's trailer, Perez's car was not there. While defendant waited outside, Perez went inside the trailer. She returned to advise defendant that Jose was not home. They waited in the trailer, then in a nearby orange orchard when it became too hot. As it was getting dark, Perez and defendant returned to the trailer. They did not turn on any lights.

Defendant knew that things with Jose were "gonna probably get aggressive" in light of the previous incident between them. He was nervous and scared. Perez was searching Jose's trailer for his gun, but she did not find a gun. Defendant found some knives in the kitchen and hid them. Defendant testified he did not leave even after learning that Jose might have a gun because he and Perez did not have a ride. They also needed the car back so that defendant could get to work in Fresno the following day.

---

[4]Ruben Marroquin, a high school classmate and former boyfriend of Perez, testified about two incidents involving Jose. In the first, Jose broke the rear window of Marroquin's car and, in the second incident, he used his own car to damage Marroquin's vehicle. Marroquin filed a police report about the latter incident, but not the former.

6.

When Jose came home, he was not driving Perez's car. He was acting suspicious however, and defendant thought he had a gun. Jose entered his trailer through the sliding glass door. The lights were off when Jose stepped into the bedroom, and he turned on the light. Defendant and Perez were there. Jose struck defendant first, saying, "'Motherfucker, my uncle's coming.'" The two began fighting and Jose ran toward the hall. Defendant thought Jose was going for the gun, so he chased Jose. They continued to fight in the hallway and defendant got a hold of Jose from behind. Defendant restrained Jose to keep him from getting a weapon; he did not want to kill Jose.

Although he had attended a few weeks of martial arts training three years earlier, defendant never earned a belt. Rather, his reference to "training skills" when he was speaking with detectives was in reference to the choke holds he observed while watching Friday night "UFC" fights on television. After making sure Jose could not move, he noticed blood coming from Jose's mouth. He thought Jose had passed out. Defendant did not remember telling detectives that Jose was not breathing while Perez went through his pockets. He recalls talking with Perez about taking Jose's stuff after Jose was lying on the floor. They took the money from Jose because their money was stolen when Perez's car and purse were taken. There were other items of value in the trailer,[5] but they did not take those items.

Once defendant realized Jose was dead, he got scared and "freaked out." Defendant wanted to leave the body there, but Perez wanted to burn it. At Wal-Mart, Perez selected and picked up most of the items purchased.

Although he told Perez he had killed people before, defendant had never killed anyone. He wanted to look "macho" and was trying to impress her.

---

[5]A television, DJ equipment and stereo components, as well as a number of CD's were undisturbed in Jose's trailer.

**Cross-Examination**

Defendant admitting telling detectives that he felt nothing after killing Jose. He denied that he was putting on an act for the jury.

Defendant's relationship with Perez moved fast; at the time of this incident, the two had been dating about a month. The day prior to the incident, Perez had defendant's name and angel wings tattooed on her back. Defendant spoke about going back to Mexico and Perez wanted to go with him. He did not remember Perez telling him that she could not go because Jose had custody rights regarding their two children.

While defendant was aware Perez had an outstanding warrant, she did not tell him she had filed a false police report against Jose. Also, Perez did not reveal she was being prosecuted for filing a false report. He did not know Perez had been convicted of stealing. Nonetheless, defendant did not believe Perez to be manipulative or a liar.

Perez was mad and wanted to beat up Jose because she assumed he had taken the car.[6] Defendant wanted Jose to stop "messing" with them, and he was prepared to follow Perez's plan to beat up Jose. He assumed the missing car would be at Jose's home, and they would get the car and beat up the victim so that he would leave them alone. They just wanted the car back. If he had to fight Jose, he would do so. However, defendant also claimed he was present to protect Perez, not to beat up Jose.

Defendant arranged to get a ride to Jose's from his friend Jose Ponce Ochoa,[7] or "Funda." He told Ochoa he needed a ride to get his car. Defendant does not remember telling Ochoa that his car had broken down and that he needed a ride to Perez's aunt's

_____

[6]There were no keys to Perez's car; it could be started with "anything."

[7]Ochoa testified that he knew defendant as "Carlos." He recalls giving defendant a ride to Orosi along with a woman, but did not recall the date. It was in the afternoon; Ochoa did not recall telling investigators it was about 4:00 p.m. Defendant told Ochoa that he needed a ride because his car had broken down but had since been fixed and needed to be picked up from Perez's aunt's house. Both defendant and the woman were calm on the drive from Goshen to Orosi. He stopped once at a store and the woman got out, went into the store, and returned with a purchase. Once in Orosi, defendant didn't want to be dropped off right at a house; rather, Ochoa dropped the two off at the intersection of Avenue 419 and Ione Road.

house. He asked Ochoa to drop them off at the corner, rather than in front of the house, because Ochoa's truck had a faulty transmission. Defendant denied that his true motive was to sneak up on Jose. Despite claiming Ochoa's truck "barely" made the trip from Goshen to Orosi due to its faulty transmission, defendant acknowledged the truck drove well enough to stop at a store on the way.

Once defendant and Perez arrived at Jose's trailer, they waited because he was not home. Defendant acknowledged he had no right to be in Jose's home. Although it was dark when Jose arrived home, defendant denied he and Perez left the lights off to surprise him. He claimed it was light enough inside the trailer because the neighbor's lights were on. Defendant does not remember telling detectives that Jose was surprised that defendant and Perez were in his home.

Defendant does not know whether Jose saw Perez when he arrived home, but he did see defendant. Jose did not seem afraid of him; defendant denied that Jose tried to run from him. Because he was afraid Jose would go for a gun, defendant choked Jose from behind. He was not thinking about squeezing as hard as he could, nor did he pay attention to whether Jose began shaking. When Jose passed out, defendant continued to choke him. When he spoke with detectives, defendant estimated he continued to choke Jose for five minutes, but he was not actually keeping track of time. Defendant used a choke hold he had seen used on television. He put Jose's neck inside the triangle created by his right hand on his left biceps while applying pressure with the palm of his left hand against Jose's head. He admitted that he did not tell detectives that he performed the choke hold to keep Jose from getting a gun.

After choking Jose, defendant tied him up because he thought Jose was still alive. He did not know what to do after realizing Jose was dead. He never called 911. He followed Perez's lead because he did not know what else to do. Defendant denied trying to make it look as if Jose had left town.

At Wal-Mart, Perez did most of the shopping because cleaning up was her idea. Defendant admitted telling detectives that they were both suggesting items to buy while

9.

at Wal-Mart, but indicated that Perez selected most of the items. Defendant denied buying the products to make it smell better at Jose's residence; rather, he stated he and Perez had planned to buy cleaning supplies even before Perez's car was taken by Jose. They had not planned to buy gloves or gas cans. Defendant did not recall that the first thing he put in the cart at Wal-Mart were the gas cans. They purchased the gas cans because Perez wanted to burn Jose's body. He did not recall telling detectives that he did most of the burning of the body; Perez did most of it. Neither did defendant remember telling detectives that both he and Perez used gloves, because only Perez did so to clean up the blood and fingerprints.

With regard to the Wal-Mart purchase, defendant explained that when he told the detectives they paid with "his money," he did not mean Jose's money. Instead, he meant the money that was found on Jose but that actually belonged to Perez and himself—the money that had been in Perez's purse inside the missing car.[8]

Defendant and Perez took two of Jose's vehicles because they did not have a ride. He tried to sell both of the vehicles so that they could buy another because neither of Jose's vehicles worked well. Defendant drove Perez to the ATM on June 30, 2010, so that she could withdraw money from Jose's account. He denied being disappointed that there was only $180 available in the account. Defendant denied planning to kill Jose to obtain money so that he and Perez could go to Mexico.

When defendant told the detectives that Jose's killing did not bother him and that he felt nothing, he meant that he felt nothing for Jose because Jose should not have taken Perez's car. Later he said he felt nothing because he was fearful. While it appears on the Wal-Mart video footage that he is smiling and having fun, defendant testified he was not calm. He was shaking and helping Perez get the items she wanted. He was only

---

[8]Defendant testified that Perez's driver's license and the children's social security cards were found in Jose's wallet and that those items had also been inside Perez's purse when the car went missing.

10.

pretending to be normal. Defendant stated he felt like everyone was staring at him as if they knew what had happened, so he told himself to act normal and calm.

Although detectives provided defendant with an opportunity to tell his side of the story, he just answered the questions he was asked. This is why he did not tell detectives that Jose had previously assaulted him.

## DISCUSSION

### I. There Was Sufficient Evidence in Support of a Lying-in-Wait Theory

Defendant claims there is insufficient evidence to support a first degree murder conviction based upon a lying-in-wait theory because the only evidence concerning entry into the victim's home came from defendant's statements that he and Perez were there to confront the victim about getting Perez's car back. Defendant contends the evidence does not establish a period of watchful waiting to harm or attack the victim, as is required, and thus, his conviction must be reversed.

When reviewing a sufficiency of the evidence claim, we determine whether, in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Examination of the record focuses on whether the evidence is reasonable, credible, and of solid value. We will presume the existence of every fact the trier could reasonably deduce from the evidence presented in support of the judgment. (*People v. Moon* (2005) 37 Cal.4th 1, 22, citing *People v. Catlin* (2001) 26 Cal.4th 81, 139, and *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

Lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death, whereas lying-in-wait special circumstance requires intent to kill. (*People v. Moon*, *supra*, 37 Cal.4th at p. 22; see also *People v. Streeter* (2012) 54 Cal.4th 205, 246.) Here, because the People dismissed the lying-in-wait special-circumstance allegation, only a wanton and reckless intent to inflict injury likely to cause death was required.

Lying-in-wait murder requires three elements be proven: (1) concealment of purpose; (2) a substantial period of watching and waiting for an opportune time to act;

11.

and (3) immediately thereafter, a surprise attack on an unsuspecting victim from an advantageous position. (*People v. Streeter*, *supra*, 54 Cal.4th at pp. 246-247; *People v. Moon*, *supra*, 37 Cal.4th at p. 22.) The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he or she acts out of rash impulse. (See *People v. Moon*, *supra*, at p. 24.)

Regarding lying in wait, the jury was instructed with CALCRIM No. 521 as follows:

> "If you decide that defendant committed murder other than felony murder, you must decide whether it is murder of the first or second degree. Felony murder is murder of the first degree. [¶] … [¶]

> "The defendant has been prosecuted for first degree murder under two theories:

> "One, the murder was committed by lying in wait; or two, felony murder.

> "Each theory of first degree murder has different requirements, and I will instruct you on each.

> "You may not find the defendant guilty of first degree murder unless all of you agree the People have proved that the defendant committed murder, but all of you need not agree on the same theory.

> "[L]ying in wait.

> "The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter.

> "The defendant murdered by lying in wait if:

> "One, he concealed his purpose from the person killed;

> "Two, he waited and watched for an opportunity to act;

> "And, three, then from a position of advantage, he intended to and did make a surprise attack on the person killed.

> "The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation or premeditation.…"

12.

We find sufficient evidence to establish the existence of each element of the lying-in-wait theory, including the second and third elements challenged by defendant. Defendant argues he and Perez only intended to go to Jose's trailer in order to get Perez's vehicle, not to attack Jose. Therefore, he reasons, there is insufficient evidence of a period of watchful waiting to harm or attack Jose. We disagree because defendant's own testimony revealed that his purpose in accompanying Perez to Jose's trailer included fighting or "beat[ing] up" Jose. Defendant made similar statements[9] to the detectives and his July 2, 2010, interview with them was played for the jury. Additionally, he and Perez waited about six hours for Jose to return home. Watchful waiting can also be inferred from defendant's testimony that he saw Jose arrive home in a different vehicle than expected and that when Jose exited that vehicle he was "acting like suspicious, like walking … if he had done something."

Defendant further argues there is insufficient evidence of "a surprise attack on an unsuspecting victim from a position of advantage" because his and Perez's purpose in entering Jose's trailer was to confront him, "but not to attack him by surprise or otherwise." Again, however, defendant's own testimony supports a finding of sufficient evidence of surprise. Perez and defendant waited in the trailer for hours and did not turn on any lights. Defendant testified that he and Perez waited in a bedroom. When Jose returned home and turned on the light in the room, he saw them standing there. Additionally, during the interview with detectives, defendant indicated Jose did not know he and Perez were inside the trailer and that they had surprised him. Beyond defendant's statements and testimony, there is evidence of surprise in the testimony offered by Ochoa. Ochoa drove defendant and Perez from their home in Goshen to Orosi at about

---

[9]The transcript of the interview reveals that defendant stated: "So, I went to the trailer and … yeah, so I got into, into a fight with him. Uh, but it was like a hand to hand fight." He stated Perez wanted to beat Jose and defendant agreed to go with her to do so. He was planning to fight with Jose. Defendant knew, while waiting for Jose, there would be some type of confrontation.

13.

4:00 p.m. in the afternoon. Defendant told Ochoa that his car had broken down in Orosi, but had since been fixed and needed to be picked up at Perez's aunt's house. Nevertheless, Ochoa did not drop off defendant and Perez at her aunt's house or at any particular house. Rather, defendant asked Ochoa to drop them off at the corner of Ione Street and Avenue 419. The jury could reasonably infer from this evidence that defendant and Perez intended to surprise Jose in his own home, attacking from a position of advantage.

Defendant's reliance upon *People v. Lewis* (2008) 43 Cal.4th 415 is misplaced because it is factually distinguishable. In *Lewis*, the defendant and others engaged in a crime spree wherein motorists were approached and their vehicles or possessions taken by force. Five individuals were killed. (*Id*. at pp. 432-440.) The defendant challenged the sufficiency of the evidence regarding a lying-in-wait special circumstance as it related to the murder of victim Jose Avina. The California Supreme Court determined that because the defendant's statement contradicted a lying-in-wait theory, there was no direct evidence admissible against the defendant that pertained to the circumstances leading up to the collision with Avina's truck. (*Id.* at pp. 507-508.) Eyewitness statements only recounted events after the shooting. The property taken from Avina's truck and linked to the defendant was not helpful because there was no admissible evidence that the taking of the property was any more than an afterthought. Finally, the physical evidence shed no light on what occurred prior to the confrontation with Avina. (*Id.* at p. 508.) The only statement that supported the necessary watching and waiting was a codefendant's statement—one that was inadmissible against the defendant. (*Id.* at pp. 508-509.) Here, as discussed above, unlike *Lewis*, defendant's own statements and testimony supported the lying-in-wait theory. Moreover, unlike *Lewis*, other evidence indicated defendant waited for a period of about six hours for Jose to return home as Ochoa testified he dropped off defendant and Perez in Orosi around 4:00 p.m. and Jose's uncle testified that Jose left his home about 10:00 p.m. on that date.

14.

Defendant also relies on *People v. Carter* (2005) 36 Cal.4th 1215 in support of his argument that there was insufficient evidence of watchful waiting for a surprise attack from a position of advantage. This case, too, is factually distinguishable and of no help to defendant. Carter engaged in a crime spree, targeting women who had previously spurned his advances. His crimes included murder, sexual assault and robbery. (*Id*. at pp. 1221-1237.) On appeal, Carter challenged the sufficiency of the evidence regarding the special circumstance of lying in wait for the murder of Janette Cullins. (*Id*. at pp. 1259-1262.) At trial, the prosecution had relied upon the presence of wood chips near a door that had been forced open in Cullins's apartment and the presence of Cullins's car parked with its engine running for several minutes that night to establish the special circumstance of lying in wait. (*Id*. at p. 1261.) The California Supreme Court determined that

> "[t]he wood chip evidence tended to show forced entry, not that the entry occurred prior to Cullins's arrival. Cullins may have arrived at her apartment before defendant did, and he may have forced his way in while she was undressing elsewhere in the apartment. Under the latter scenario, the lying-in-wait special circumstance would rely upon the neighbor who heard the car engine running, and the time of that event cannot be pinpointed. Moreover, the car idling, besides occurring at an uncertain time, does not strongly imply that defendant was waiting in the car to attack Cullins; if defendant had planned a home invasion when Cullins arrived home, he likely would have turned off the engine so as not to attract attention. We therefore set aside the special circumstance of lying in wait." (*Id*. at pp. 1261-1262.)

The facts in *Carter* are easily distinguishable from the facts of this case. Defendant's presence in the trailer before Jose arrived is undisputed. This fact was established not by speculative inferences but by direct evidence. As already explained, that evidence comes in the form of defendant's own testimony, his statements to detectives, and other testimony. Defendant testified he and Perez waited in a bedroom of Jose's trailer with the lights off. Jose was not aware of their presence until he turned on the light and saw defendant and Perez standing in the room. Defendant told detectives that Jose did not know he and Perez were inside the trailer and that Jose was surprised.

15.

This evidence is bolstered by the testimony of Ochoa, who indicated that defendant did not want to be dropped off in front of any particular house; rather, he asked to be let out at an intersection.

In sum, we are not persuaded by defendant's arguments. Defendant himself testified he and Perez intended to assault Jose, and they waited for a period of six hours in Jose's empty trailer, never turning on the lights as dark descended. The trier of fact could reasonably deduce from this evidence that defendant concealed his purpose from Jose, waited and watched for an opportunity to act, and then, from a position of advantage—a dark bedroom in an empty home at night—surprised Jose before choking him to death.

## II. Admission of Evidence Regarding Perez's Tattoo Was Not Error

Defendant contends the trial court erred in admitting evidence of Perez's tattoo because the tattoo amounts to hearsay.

During testimony by lead detective Robert Buenrostro, the prosecutor asked whether the detective had noticed any tattoos on Perez at the time of her arrest. Defense counsel objected based upon relevance and the court called for a sidebar. Outside the presence of the jury, the prosecutor explained that Perez had a tattoo on her back bearing defendant's name and that the two had been dating for only a month. He contended the tattoo showed how committed Perez and defendant were to one another, how madly in love Perez was, and how defendant needed to meet her expectations. Defense counsel responded that the tattoo "[s]hows her actions not his actions," and continued to object based upon relevancy. The trial court then stated the tattoo had "arguable relevance." Defense counsel again stated the tattoo was "evidence of her actions, though, not his actions." The trial court indicated it understood counsel's argument, but overruled the objection. Following a brief recess, the detective testified that at the time of her arrest,

Perez had a tattoo with the name "Miguel Angel" surrounded by angel wings on her back.[10]

On appeal, defendant maintains the trial court should have excluded evidence of Perez's tattoo on hearsay grounds. He argues the tattoo constitutes nonverbal conduct intended as a substitute for verbal expression. Because defendant had no opportunity to cross-examine Perez, he contends his constitutional rights pursuant to the Sixth Amendment to the United States Constitution have been violated.

Hearsay is "'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.'" (Evid. Code, § 1200, subd. (a).) Hearsay is not admissible unless it qualifies under some exception to the hearsay rule. (*Id.*, at subd. (b).) For purposes of the hearsay rule, a "statement" is defined as "oral or written verbal expression" or "nonverbal conduct … intended … as a substitute for oral or written verbal expression." (Evid. Code, § 225.)

Although we assume tattoos might constitute hearsay, depending on what they are offered to prove (*People v. Lewis*, *supra*, 43 Cal.4th at pp. 496-498), here, defense counsel's objections were based on relevancy and, later, a lack of foundation, rather than hearsay. "'It is, of course, "the general rule"' —to which we find no exception here— "'that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal."'" (*People v. Alvarez* (1996) 14 Cal.4th 155, 186; see also *People v. Chaney* (2007) 148 Cal.App.4th 772, 776-780.) Here, defendant has forfeited this claim by failing to make the necessary hearsay objection in the trial court. (Evid. Code, § 353.)

Even if his objections were construed to include a hearsay objection, those objections did not preserve a constitutional claim that admission of the testimony

---

[10]When a photograph of the tattoo on Perez's back was identified and subsequently admitted during cross-examination of defendant, defense counsel objected to its admission based upon relevancy and a lack of foundation.

17.

regarding Perez's tattoo violated defendant's right to confront witnesses under the rule of *Crawford v. Washington* (2004) 541 U.S. 36, 68. (*People v. Chaney*, *supra*, 148 Cal.App.4th at pp. 777-778 [kidnapping defendant's objection to officer's testimony concerning witness's statements at scene of crime, emphasizing his inability to cross-examine witness, was based on hearsay, and thus did not preserve constitutional claim that admission of witness's statement violated defendant's right to confront witnesses under rule of *Crawford v. Washington*]; *People v. Waidla* (2000) 22 Cal.4th 690, 726, fn. 8 [a "'bare reference'" to an inability to cross-examine is insufficient to satisfy the requirement of a timely and specific objection on constitutional grounds].)

In *People v. Zamudio* (2008) 43 Cal.4th 327, 353, the court explained that

> "a constitutional claim is not cognizable on appeal unless (1) it 'is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution.' [Citation.]" (Italics omitted.)

Defendant's constitutional claim does not fall under the first exception. As for the second exception, a claim under *Crawford* does involve facts or legal standards different from those defendant asked the trial court to apply on the basis of a relevancy or lack of foundation objection. Defendant did not offer a constitutional basis for his objection. Thus, defendant's claim has been forfeited for purposes of appellate review.

## III. Prosecutorial Misconduct Regarding "Angel of Death" References

Next, defendant contends the prosecutor committed prejudicial misconduct by arguing to the jury that Perez's tattoo "symbolized … defendant as the 'angel of death.'" He asserts his objection to the admission of this evidence should have been sustained and that the prosecutor's argument amounted to denigration and invited speculation regarding the lying-in-wait theory and express and implied malice. We disagree.

18.

"'The applicable federal and state standards regarding prosecutorial misconduct are well established. "'A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct so "egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'" [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 506.)

Prosecutorial misconduct requires reversal only if it results in prejudice to the defendant. (*People v. Fields* (1983) 35 Cal.3d 329, 363.) Where it infringes upon the defendant's constitutional rights, reversal is required unless the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict. (*People v. Harris* (1989) 47 Cal.3d 1047, 1083.) Prosecutorial misconduct that violates only state law is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from the objectionable conduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133.)

The issue of prosecutorial misconduct is forfeited on appeal if not preserved in the trial court by timely objection and request for admonition. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.) If an objection has not been made, "'"the point is reviewable only if an admonition would not have cured the harm caused by the misconduct"'" (*id*. at pp. 1000-1001) or if an objection would have been futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820-821, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; see also *People v. Pearson* (2013) 56 Cal.4th 393, 425.)

Here, during closing argument, the prosecutor argued as follows:

"[PROSECUTOR]: … Got this relationship; they're living together. They're getting tattoos with each other's names on them. He's wanting to go to Mexico. He's wanting to go with her, you know, but there's a third wheel. There was a third wheel.

"So she gets her tattoo shortly before the crime, Miguel Angel. Isn't that kind of ironic? You got the angel wings. You got Miguel Angel here.

19.

He turned out to be her angel of death. He turned out to be her angel of death, and they talked about it before. They talked about killing before, killing, people, before they go over to his house. You know, this is a short relationship, a month, but within that month, he's bragging to her how he's killed before."

Subsequently, the prosecutor stated: "So we have this angel of death, and look at him, look at him before the crime and look at him after the crime." These comments did not elicit objections. Shortly thereafter, the prosecutor referred to defendant's purported calm: "How is he acting on that ride over there? Calm. Anna Reyes, the [Wal-Mart] cashier, how is he acting at that checkout stand? Calm. [¶] This is a man without a conscience." Neither did this particular comment elicit an objection.

Later, speaking of the Wal-Mart purchases that were found in the Perez residence at the time of the arrests, the prosecutor argued:

"[PROSECUTOR]: These items are found at the residence, and it's sadistic. The Fabreze [*sic*], you know, that they purchased at the Wal-Mart to get rid of any stench after they killed the victim in his own residence, the Clorox wipes in that truck here. We got these in the bedroom, and these babies of the victim sleeping on the bed, you know, the black towel. What is that? That's sick. That's sick. It's a man without a soul.

"[DEFENSE COUNSEL]: Your Honor, I'm gonna object. Can we have a side-bar, please?

"THE COURT: Yes.

"(Whereupon, the following proceedings were had at side-bar, outside the presence of the jury, to wit:)

"[DEFENSE COUNSEL]: That's misconduct to denigrate the defendant by calling—saying things like he doesn't have a soul or in the case of People versus Herring which is a 1993 case, 20 Cal.App.4th 1066 at 1077[]. In that case—[¶] … [¶] … Used the same thing, they called a person a parasite, defendant I'm talking about. He called him a parasite, other name calling, stuff like that.

"So far, he's used him—called him angel of death, called him other names. It's not appropriate. It's denigration of defendant, misconduct. I'd object on those grounds.

20.

"THE COURT:  What remedy do you seek?

"[DEFENSE COUNSEL]:  What remedy do I seek, Judge?

"THE COURT:  Yes.  What—you're objecting.

"[DEFENSE COUNSEL]:  Sustain the objection and tell him not to use that kind of pejorative language towards the defendant.

"THE COURT:  Okay."

The trial court overruled defense counsel's objection, stating "[t]he angel of death is—it's proper argument.  He's referring to something within—within the evidence.  [¶] Counsel is allowed some latitude.  I agree that he's not allowed to denigrate the defendant.  I don't find the angel of death to be a denigration."  Defense counsel then expressly stated that he "*didn't object to that comment.  It was the second one …*" (italics added), meaning the comment about defendant having no soul or no conscience.  The trial court responded that it did not find the soulless comment to be a denigration and overruled the objection.  However, before the jury returned, the trial court reversed position, noting that it had "taken a look at the court reporter's notes [regarding the prosecutor's argument and was] going to direct the jury to disregard the last statement, 'It's a man without a soul.'"  The trial court then admonished the jury that it "shall disregard the last bit of the argument, that part of the argument, quote, 'It's a man without a soul.'  You'll disregard it, won't consider it in any way."

Significantly, we note that defendant did *not* object to the prosecutor's statements referring to defendant as the "angel of death."  In fact, defense counsel expressly indicated that he was objecting *only* to the comment about defendant having no soul.[11]  As noted earlier, the general rule is that "'"a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested the jury be

---

[11]The trial court admonished the jury about the "man without a soul" comment and defendant does not argue that the admonishment failed to cure any harm that may have resulted.

21.

admonished to disregard the impropriety. [Citation.]"'" (*People v. Ayala* (2000) 23 Cal.4th 225, 284; see also *People v. Cunningham*, *supra*, 25 Cal.4th at p. 1000.) Because defendant is arguing prosecutorial misconduct on a different basis than that argued below, we find he has forfeited this argument on appeal.

Moreover, an admonition would have cured any harm. On this record, defendant cannot establish that he should be excused from making a timely objection to the "angel of death" comment, nor can he establish that a request for an admonition would have been futile. Particularly where, as here, the court did admonish the jury regarding the prosecutor's "man without a soul" comment. (*People v. Hill*, *supra*, 17 Cal.4th at pp. 820-821.) That said, the "angel of death" commentary does relate to the evidence because defendant's middle name is Angel, there was testimony that Perez and defendant had talked of killing other people in the past, and Jose had been choked to death by defendant. Thus, to characterize defendant as an "angel of death" is not misconduct.

Lastly, this case is distinguishable from *People v. Herring* (1993) 20 Cal.App.4th 1066, relied upon by trial counsel and referenced by appellate counsel. In *Herring*, the prosecutor made improper comments about defense counsel, including "'I chose this side and he chose that side. My people are victims. His people are rapists, murderers, robbers, child molesters. He has to tell them what to say. He has to help them plan a defense. He does not want you to hear the truth.'" (*Herring*, *supra*, at p. 1073.) With regard to the defendant, the prosecutor called him "'primal man in his most basic level.… He wouldn't know what love was. He's like a dog in heat.…' 'This is primal man. He thinks all I have to do is put a little force on her. Women love this. Every man knows that.…' 'He's like a parasite.'" (*Id*. at pp. 1073-1074.) The trial court sustained the defendant's objections and admonished the jury. (*Id*. at p. 1074) The appellate court found the admonition to the jury that it should disregard all remarks and that the only evidence the jury should consider was that derived from testimony on the witness stand, or evidence marked and received, was insufficient to cure the harm. (*Id*. at pp. 1074-1075.) *Herring* is distinguishable from this matter. The language and commentary in

*Herring* were unrelated to the evidence and directed at the defendant's character in such a way as to encourage the jury to disregard the law. As explained *ante*, that did not occur in this case.

In sum, defendant has forfeited any argument regarding the prosecutor's "angel of death" commentary for he failed to object, and he cannot show that his failure to do so should be excused or that an admonition to the jury would have been futile. Even so, the claim fails on the merits as the commentary relates to the evidence.

## IV. There Were No Repeated Instances of Misconduct and the Motion for Mistrial Was Properly Denied

Defendant asserts that following the misconduct complained of previously (see part III., *ante*), the prosecutor committed repeated instances of misconduct during his cross-examination, and again during closing argument. For these reasons, defendant argues his motion for mistrial based upon that misconduct should have been granted. We find otherwise.

### A. The Applicable Legal Standards

As noted above, a "prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct" that is so egregious it infects the trial with unfairness, resulting in a denial of due process. A prosecutor violates state law if he or she "use[s] deceptive or reprehensible methods" in attempting to persuade the court or the jury. (*People v. Navarette*, *supra*, 30 Cal.4th at p. 506.) Reversal is required where prejudice results. (*People v. Fields*, *supra*, 35 Cal.3d at p. 363.) If, however, the reviewing court determines beyond a reasonable doubt that the misconduct did not affect the jury's verdict, reversal is not required. (*People v. Harris*, *supra*, 47 Cal.3d at p. 1083.) Where prosecutorial misconduct violates only state law, reversal is required when it is reasonably probable that a result more favorable to the defendant would have occurred had the prosecutor refrained from the objectionable conduct. (*People v. Barnett*, *supra*, 17 Cal.4th at p. 1133.)

23.

In the absence of a timely objection and request for admonition, the issue of prosecutorial misconduct is forfeited on appeal. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1000.) Only where an objection would have been futile, or where an admonition would not have cured the harm, will a failure to object be overlooked. (*Id.* at pp. 1000-1001; *People v. Hill*, *supra*, 17 Cal.4th at pp. 820-821.)

## B.     The First Instance of Alleged Prosecutorial Misconduct

Upon commencing his cross-examination of defendant, the prosecutor asked as follows:

"[PROSECUTOR]:  Told the officer you felt nothing for killing [Jose]; right?  Right?

"[DEFENSE COUNSEL]:  Objection, your Honor, he's badgering the witness.  He should be allowed to answer the question.

"THE COURT:  Give him a chance to answer, Mr. [Prosecutor].

"[PROSECUTOR]:  You told the officer you felt nothing for killing him; right?

"[APPELLANT]:  Yes.

"Q.  You were a different Miguel Enciso who was interviewed right after killing [Jose] than you are today; isn't that true?

"[DEFENSE COUNSEL]:  I'm gonna object to that question.

"THE COURT:  Sustained.

"[PROSECUTOR]:  You had time to work out how you want to present yourself to the jury, haven't you?

"A.  I don't understand your question.

"Q.  You went over with your attorney how you're going to present your demeanor to the jury; right?

"A.  No.

"Q.  When you're arrested, your demeanor is what we saw on that video; right?

24.

"A.  I don't understand your question.

"Q.  The way you acted on the day you were arrested is much different than how you're acting here today; correct?

"A.  I don't know I can tell.

"Q.  When you were arrested, you didn't have a care in the world; correct?

"A.  I don't understand your question.

"Q.  You understand—understood all his questions [referring to defense counsel]; is that because you went over everything with him several times?

"A.  No.

"Q.  You know that we all watched your video of the interview; correct?

"A.  Yes.

"Q.  And we all watched you on [the] Wal-Mart [video]; right?

"A.  Yes.

"Q.  So you're here in front of this jury trying to put on an act right now, aren't you?

"A.  No.

"[DEFENSE COUNSEL]:  I'm gonna object and ask to strike.  That last answer is argumentative.

"THE COURT:  Overruled."

## C.    The Second Instance of Alleged Prosecutorial Misconduct

Immediately following a sidebar on an unrelated issue, the prosecutor asked defendant the following:

"[PROSECUTOR]:  That sad face you just put on, how come you didn't have that when the jury was back in the jury room?

"[DEFENSE COUNSEL]:  Objection, your Honor, argumentative, relevance.

"THE COURT: The jury will disregard that. [¶] Keep in mind that statements by counsel and questions are not evidence. You will totally disregard that. You will decide this case based upon what you observe in this courtroom when the witness is on the witness stand and every witness is on the witness stand, nothing else. [¶] All right. Ask a question. [¶] Is there any direction that the court has given so far that any juror will have any difficulty following? [¶] All right. Continue."

During closing argument, the prosecutor commented upon defendant's "sad, pouting face" and argued defendant "tries to make it look like he's the victim in all this, but who's really the victim? He puts on an act, and you know this 'cause we see him at the Wal-Mart video. You see him without a care in the world right after he choked out the victim, tied him up and went to go get those cans to burn him." No objection was made to the foregoing.

## D. The Third Instance of Alleged Prosecutorial Misconduct

During recross-examination, the following colloquy occurred:

"[PROSECUTOR]: Isn't it true the only act that's going on is the way you're testifying here in front of the jury?

"[DEFENSE COUNSEL]: Objection, your Honor, that's argumentative.

"THE COURT: Objection's overruled.

"[PROSECUTOR]: Isn't that true.

"[DEFENDANT]: No, sir.

"Q. Last week at the end of direct examination, you gave an indication like you were crying; right?

"A. I wasn't pretending. I was—that's the way I feel.

"Q. Couldn't get any tears to come out of your eyes, though, could you?

"[DEFENSE COUNSEL]: Objection, your Honor, that's argumentative.

"THE COURT: It is.

"[DEFENSE COUNSEL]: Move to strike the question.

26.

"THE COURT:  The—ladies and gentlemen, you understand that questions are not evidence.  You are the observers.  You can, of course, view the witness while the witness is testifying.  You are the judges of the facts.  [¶] … [¶] We've talked about this before, and I'm sure you have all this in mind.  Questions are not evidence.

"[PROSECUTOR]:  The real Miguel Enciso is who we see in 64;[12] isn't that true?

"[DEFENSE COUNSEL]:  Objection, your Honor, that's argumentative, too.

"THE COURT:  Sustained.

"[DEFENSE COUNSEL]:  I would ask to go to side-bar, please.

"THE COURT:  All right.  [Jury in recess.]

"[DEFENSE COUNSEL]:  Beginning another series of argumentative questions.  It's misconduct on top of being argumentative, and I'm saying it on the record.  I already cited the cases before we picked up again today.

"[PROSECUTOR]:  This defendant is putting on a show, and I know he's putting on a show, and I have evidence of his character when he's not putting on a show, when he's being photographed, when he's being interviewed, the Wal-Mart, and that is in no way argumentative.

"I could ask him these questions.  He could deny them, but just because I ask a question doesn't make it argumentative.  He's putting on a show, and he didn't [at] all these other places where I have images of him or recordings of him.

"THE COURT:  The—the record speaks for itself insofar as what questions have been asked, the court's rulings on them, and your concern is noted, [counsel].

"[DEFENSE COUNSEL]:  Thank you, your Honor."

After recess, and when the proceedings resumed in front of the jury, the People opted not to ask any further questions of defendant.

---

[12]Referring to People's exhibit 64, defendant's booking photo.

## E.     The Fourth Instance of Alleged Prosecutorial Misconduct

Finally, defendant contends that during his closing argument, the prosecutor erred by arguing as follows while discussing felony murder:

"[PROSECUTOR]:  There's a special—I've—there's a special circumstance of CALCRIM 730, and this is easy, too.  It's felony murder, same thing.  You have the instructions.  It's just what I argued.  So there's going to be a first degree murder finding and then right below that special allegation felony murder.  [¶] … [¶] Defendant got up and lied to you.  He was essentially trying to get you to continue to burn that body.

"[DEFENSE COUNSEL]:  Your Honor, I'm gonna object to that.

"THE COURT: I don't understand that last sentence.

"[PROSECUTOR]:  I haven't finished.

"THE COURT:  We need to have a side-bar.

"(Whereupon, the following proceedings were had at side-bar, outside the presence of the jury, to wit:)

"THE COURT:  All right.

"[DEFENSE COUNSEL]:  It's improper to ask them to—it's an appeal to the emotions of the jury to tell them that they're continuing to burn the guy because of—that's just improper argument.

"THE COURT:  What was the rest of your sentence going to be?

"[PROSECUTOR]:  That he's lying to you, trying to trick you into burning the body and covering up his crime.

"[DEFENSE COUNSEL]:  I object, it's improper argument.

"THE COURT:  Well, that's nonsensical [in] my view, [I am] just gonna strike it.  You may argue that he lied—

"[PROSECUTOR]:  Okay, okay.

"THE COURT:  —and you may argue why and your position he lied; okay.

"[PROSECUTOR]: Okay.

"(Whereupon, the side-bar proceedings were concluded.)

28.

"THE COURT:  The reference to continuing to burn the body, you are to disregard that."

## F.     Analysis

We are not persuaded by defendant's arguments that the prosecutor's comments amounted to prejudicial misconduct nor, in the instances of a failure to object, are we convinced that such an objection would have been futile or that an admonition would not have cured the harm.

### 1.     First Instance

With regard to the first alleged instance of misconduct, defense counsel objected on the basis that the question, "So you're here in front of this jury trying to put on an act right now, aren't you?" was argumentative.  That objection was overruled and defendant's testimony continued until the day's proceedings were concluded.  Proceedings resumed the following Tuesday, November 22, 2011, and counsel argued to the trial court that the prosecutor's earlier question about whether defendant had "carefully worked out his demeanor and testimony with counsel before testifying" was improper.  The trial court pointed out, however, that no objection was made to that question.  Defense counsel then argued that had he objected, he would have drawn attention to the behavior and that the jury may have been given the impression that the prosecutor had some additional information that was not brought out.  The trial court stated that an "extreme implication [would be] that somehow [defense counsel had] suborned perjury," that the court would have sustained an objection and given an admonition and, therefore, the trial court invited counsel to propose such an admonition. Defense counsel asked to finish making his record before proposing the admonition, and the trial court agreed.

Shortly thereafter, counsel asked to be permitted to draft an admonition in writing for the court's consideration.  Counsel submitted the admonition after proceedings

29.

resumed following a break between November 23 and December 5, 2011.[13]  Specifically,

on December 6, 2011, counsel noted that he wrote "an admonition with respect to what

happened in the cross-examination of [defendant].  I wrote an admonition which the court

is including in the instructions.  The admonition is essentially what I proposed, and I

don't have any objection to its wording in the final version that's going to be given to the

jury."

The trial court indicated the "special instruction that the parties have agreed on"

provides that "the prosecutor erred when asking the defendant if he went over his

testimony and demeanor with counsel before testifying in this trial.  Such questions are

not allowed.  The jury is instructed to disregard the questions, and the implications from

the questions and not consider them for any reason."  With regard to whether answers

were given to the questions and whether those answers should be stricken, the following

discussion occurred:

> "THE COURT:  … [Defense counsel], are you satisfied that this instruction addresses—fully addresses the issue?

> "[DEFENSE COUNSEL]:  When we took this motion up, I was and still am concerned about the questions in their totality, the implications thereof.  I think if we're giving a admonition to cure that, I'm satisfied that this admonition does that if it's the remedy that's available.

> "THE COURT:  All right.  There was not an objection to the question [at issue].  I have stated—I don't know if I've stated this on the record or not.

> "Certainly, if there had been an objection at the time, the court would have dealt with the issue.  This is a very pointed admonition, if you will, to the jury relating to such questions and that issue which is really not a proper issue at all for the jury to consider.

> "I have stated, counsel, that I would strike the questions and answers, and I think that should be done anyway at this point because if the

_____

[13]All parties were aware of the trial court's unavailability during this period and expressly agreed to the extended break in the proceedings.

jury asks for a reread of [defendant]'s testimony, that should not be part of the reread."

Thereafter, the trial court directed the court reporter to strike the answers and questions from the record. The special instruction or admonition was read to the jury prior to its deliberations.

Defendant contends this admonition is insufficient to cure the harm caused because the "accumulation of misconduct overwhelmed the effect of repeated admonishments," and the "jury's verdict was necessarily affected by questions and argument, given the jury's assumed special regard for the prosecutor." We simply do not find repeated instances of misconduct as asserted by defendant, and therefore, disagree that any misconduct "overwhelmed the effect" of the admonishments given. Moreover, as the trial court recognized, with regard to this particular assertion of error, defense counsel failed to object in the first instance. While he belatedly argued that his failure to object was the result of a risk of harm to his client or futility, the record does not support such an argument, particularly where the court sustained previous objections. (*People v. Cunningham*, *supra*, 25 Cal.4th at pp. 1000-1001; *People v. Hill*, *supra*, 17 Cal.4th at pp. 820-821.) Additionally, "[a]n objection always will highlight the matter to which the objection is directed. Allowing this consequence to overcome the requirement of an objection would negate the rule that a party must object and request an admonition in order to preserve a claim of error and enable the trial court to correct the asserted error." (*People v. Foster* (2010) 50 Cal.4th 1301, 1352-1353.)

Additionally, to the degree the questions posed to defendant regarding his demeanor at trial could be interpreted to be negative commentary about defense counsel ("You went over with your attorney how you're going to present your demeanor to the jury; right?" and "[I]s that because you went over everything with him several times?"), the prosecutor's questions were not so extreme that an admonition would not have cured any harm. (See, e.g., *People v. Gionis* (1995) 9 Cal.4th 1196, 1216-1217 [prompt

31.

admonition corrected any jury misconceptions caused by statement, ""'"You're an attorney. It's your duty to lie, conceal and distort everything and slander everybody"'"'"].)

## 2. *Second Instance*

As noted above, the second instance of alleged misconduct involves references to defendant's "sad" expression during trial.

Of the two comments, the first occurring during cross-examination ("The sad face you just put on, how come you didn't have that when the jury was back in the jury room?"), defense counsel objected prior to any answer by defendant and the trial court immediately admonished the jury that it was not to consider the question. The court explained further that the jury's observations concerning the testifying witnesses were a proper consideration. Because the objection was sustained, and defendant did not answer the question, no prejudice ensued. (*People v. Dykes* (2009) 46 Cal.4th 731, 763.) The swift admonition given cured any possible harm. (*People v. Gionis*, *supra*, 9 Cal.4th at pp. 1216-1217.)

The next comment concerning defendant's expression came during the prosecutor's closing argument ("The defendant testifies before you, puts on his sad, pouting face and tries to make it look like he's the victim in all this …"); however, to this comment, defense counsel failed to object. Therefore, defendant has forfeited the argument on appeal. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1000.) Defendant argues that because the "prosecutor's comment merely added to the bulk of improper insinuation," he should be excused for failing to object because the "misconduct is repetitious." However, as explained herein, we have found no repetitious error on the part of the prosecutor. Unlike *People v. Hill*, *supra*, 17 Cal.4th at page 845, upon which defendant relies, here there simply was not the "sheer number of instances of prosecutorial misconduct and other legal errors rais[ing] the strong possibility that the aggregate prejudicial effect" was greater than any effect those errors had standing alone.

### 3.     *Third Instance*

As quoted fully above, these alleged instances of misconduct also concern defendant's demeanor.  Defendant argues the questions were denigrating and argumentative, and that the admonitions given were insufficient.  Again, we do not agree.

Defendant's objection to the first question complained of in this section, "Isn't it true the only act that's going on is the way you're testifying here in front of the jury," was overruled by the trial court.  The question was not improper because defendant testified, and by doing so, put his contemporaneous feelings of remorse at issue.  (*People v. Watkins* (2012) 55 Cal.4th 999, 1031.)  At trial, defendant testified that he did not know what to do after realizing Jose had died, and he merely followed Perez's lead and acted as though he was unaffected by Jose's death.  Because evidence was presented to the contrary—the video of defendant and Perez shopping shortly after Jose's killing wherein the two appear in good spirits, as well as defendant's comments during the investigative interview that he was not troubled by Jose's death—the prosecutor's question regarding defendant's demeanor did not amount to misconduct.  In any event, the question did not infect the trial with such unfairness so as to result in a denial of defendant's rights.  (See *People v. Earp* (1999) 20 Cal.4th 826, 858.)

With regard to the prosecutor's questions concerning defendant having cried during direct examination, defense counsel's objection was sustained as argumentative, and the question was stricken at defense counsel's request.  Again, the jurors were reminded that questions are not evidence and that they "are the judges of the facts." Because the objection was sustained, and an admonition was given, we find no prejudice. (*People v. Dykes, supra,* 46 Cal.4th at p. 763; *People v. Gionis, supra,* 9 Cal.4th at pp. 1216-1217.)

Lastly, when the prosecutor asked defendant whether "the real Miguel Enciso" was the individual depicted in his booking photograph (and as such, an individual exhibiting a very different demeanor than defendant during trial), defense counsel

objected. The objection was sustained. At sidebar, defense counsel argued the prosecutor was asking a "series of argumentative questions" that constituted misconduct. In reply, the prosecutor explained his questions were based upon the evidence. He expected the evidence to establish that defendant's demeanor at trial was different from that on three other occasions: (1) while defendant was shopping with Perez in Wal-Mart after he had killed Jose, (2) at the time of his booking, and (3) again during his interview with detectives. According to the prosecutor, defendant exhibited a very different character (happy, carefree, untroubled by having killed Jose) during those occasions than his demeanor at trial, to the effect defendant was "putting on a show." The trial court indicated that the record spoke for itself and that its rulings did as well. Thereafter, no further questions were asked and defendant's testimony concluded. Defense counsel did not ask that the jury be admonished regarding this question, either before or after the side bar. Because defendant did not request an admonition following his objection, he has forfeited this claim. (*People v. Cunningham, supra*, 25 Cal.4th at p. 1000 [proper claim of prosecutorial misconduct requires timely objection and request for admonition].) Further, there is no indication that any requested admonition would have been futile, or that such an admonition would not have cured any harm. (*People v. Foster*, *supra*, 50 Cal.4th at pp. 1350-1351.) Moreover, "because the trial court sustained objections to the argumentative element of the prosecutor's questioning, we assume any prejudice was abated." (*People v. Dykes, supra,* 46 Cal.4th at p. 764.)

### 4.     *Fourth Instance*

During closing argument, the prosecutor referenced first degree murder and a related jury instruction, then stated: "Defendant got up and lied to you. He was essentially trying to get you to continue to burn that body." Defense counsel objected to the statement as improper argument, appealing to the emotions of the jury. The trial court found the statement to be "nonsensical" and struck it, admonishing the jury that it was not to consider the reference. We agree with the trial court that the statement made little or no sense. Further, defendant does not explain how a statement deemed

34.

nonsensical by the trial court, and stricken for consideration by the jury via the trial court's admonishment, is prejudicial. To the contrary, we find the admonishment cured any harm such a statement could have possibly had even if understood by the jury. Moreover, "'[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence'" during closing argument. (*People v. Dykes*, *supra*, 46 Cal.4th at p. 768, citing *People v. Ledesma* (2006) 39 Cal.4th 641, 726.) Thus, to the degree the prosecutor's comment can be understood to argue that, through lies told during his testimony at trial, defendant was continuing to victimize Jose, the statement— as awkward as it was—could have been interpreted to be a fair comment upon the evidence.

Defendant's reliance upon *People v. Hill* in support of his prosecutorial misconduct arguments is misplaced. There, defense counsel "was subjected to a constant barrage of unethical conduct, including misstating the evidence, sarcastic and critical comments demeaning defense counsel, and [the] propounding [of] outright falsehoods" by the prosecutor. (*People v. Hill*, *supra*, 17 Cal.4th at p. 821.) In *Hill*, it was noted that by objecting to the foregoing, defense counsel "risk[ed] repeatedly provoking the trial court's wrath, which took the form of comments before the jury suggesting he was an obstructionist, delaying the trial with 'meritless' objections." (*Ibid*.) Unlike *Hill*, there was no "constant barrage" of misconduct by the prosecutor. Also, the trial court was not critical of defense counsel's objections, nor is there any indication on this record that had defense counsel objected more frequently, he would have "provok[ed] the trial court's wrath." The misconduct recorded in *Hill* is plainly distinguishable from the questions and statements alleged to be misconduct here.

In conclusion, several of defendant's arguments have been forfeited for purposes of appeal due to a lack of objection or lack of an excuse for a failure to object. To the degree defendant's remaining contentions are viable for purposes of appeal, we do not

find a pattern of misconduct or use of deceptive or reprehensible methods amounting to prosecutorial misconduct.

### G.     The Motion for Mistrial

Defendant maintains that his motion for mistrial should have been granted because the prosecutor's questions and statements amounted to serious misconduct requiring reversal.

We review the denial of a motion for mistrial under the deferential abuse of discretion standard. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 984.) "A motion for mistrial is directed to the sound discretion of the trial court. We have explained that '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 985–986, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854.)

Defense counsel moved for a mistrial following his belated objection to the prosecutor's questions regarding defendant's demeanor:

> "[DEFENSE COUNSEL]:  I am going to make that motion because I'm not sure it can be cured because of the constitutional right implications and the fact that it really denies the defendant a fair trial. They obviously know—it's not evidence that they can put on to rebut whatever he says. It's the implication of the question that's so damaging. [¶] … [¶] If the court's not willing to grant a mistrial, I think that an attempted admonition should be made ….

> "THE COURT:  All right. I will say that tentatively, before I hear from [the prosecutor], that I would not grant a motion for mistrial. There has—this was one of many, many questions that [the prosecutor] asked on cross-examination, and because of that, in part, it is not something that the court believes the jury is going to attach anything to, particularly if there is an admonition, and I think it can be cured by way of an admonition, simple admonition.

"And again, I realize I haven't heard from the People yet, but a proper admonition I think would cure it, and I'm inclined to give it at this point."

Later, the court stated, "[s]o the motion for mistrial is denied."

Here, the trial court did not abuse its discretion in denying the motion for mistrial. It expressly determined that any harm caused by the prosecutor's questions could be cured by a simple admonition. Moreover, as explained in detail above, we have found no prosecutorial misconduct. Therefore, we likewise hold the trial court's denial of defendant's motion for mistrial was proper.

## V.     Lying-in-Wait Murder and Self-Defense

Defendant contends the prosecutor misstated the law pertaining to the availability of complete and imperfect self-defense to a charge of first degree murder based upon on a lying-in-wait theory. He argues this misstatement denied him his fundamental right to present a defense and, thus, his conviction must be reversed. We do not agree.

Murder is an unlawful killing committed with malice aforethought. (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) Malice may be express or implied; it is express when the defendant intends to kill, and it is implied when the defendant deliberately commits an act that is dangerous to human life and acts with knowledge of the danger and a conscious disregard for life. (*Ibid*.)

Once a jury has found the defendant committed murder (i.e., a killing with express or implied malice), it must then determine if the murder was of the first or second degree. First degree murder includes murders committed by lying in wait. (*People v. Stanley* (1995) 10 Cal.4th 764, 794.) A lying-in-wait murder occurs when the defendant conceals his or her purpose, engages in a substantial period of watching and waiting for an opportune time to act, and inflicts a surprise attack on an unsuspecting victim from a position of advantage. (*People v. Gurule* (2002) 28 Cal.4th 557, 630.)

First degree lying-in-wait murder does not require intent to kill; rather, the offense only requires the conscious disregard for life associated with implied malice. (*People v.*

*Ceja* (1993) 4 Cal.4th 1134, 1140, fn. 2; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1023; *People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 309; *People v. Laws* (1993) 12 Cal.App.4th 786, 793–794.)

Defendant's final argument centers on a statement made during the People's closing argument. In particular, while specifically discussing the jury instructions given by the trial court, the prosecutor addressed lying-in-wait murder in the following context:

> "[PROSECUTOR]: Then you go and we got lying in wait. Lying in wait, CALCRIM 521. These are summaries again. Go to the instructions if you have a doubt. Lying in wait. You concealed your purpose. You wait in the dark in another's man's home till he gets home and chokes him out. Yeah, that's concealing your purpose.

> "You wait and watch for an opportunity to act. You wait in his home in the dark until he comes home, and you choke him out. Yeah, you wait and watch for an opportunity to act.

> "You did a surprise attack. You wait in another's man's home in the dark until he came home and you choked him out. Yeah, it was a surprise attack. In the defendant's own words that the victim was surprised, own words.

> "You get here—and I'm going over this again—from second degree murder which was express or implied. So with implied, no intent to kill is required. It's not concealing his purpose to kill. It's not he waited and watched for an opportunity to kill. It's not he did a surprise attack to kill. It's that he went there, in his own words, to beat him up, wait in the dark, choked him out.

> "That's a confession. Now he wants to deny that he intended to kill. Whatever, you don't have to make that finding. He did. He did, but you don't have to make that finding.

> "*Only for second degree murder are there defenses. Felony murder, which I'm gonna go over after this, no defenses.*

> "So you heard about self-defense, imperfect self-defense, heat of passion. Okay, what—I been going over with you how absurd any type of self-defense is.…" (Italics added.)

Defendant takes particular issue with the prosecutor's comments that "[o]nly for second degree murder are there defenses" and "[f]elony murder … no defenses."

38.

Notably, defendant did not object to the prosecutor's statement. Therefore, he has forfeited the issue for purposes of appeal. (*People v. Mayfield* (1993) 5 Cal.4th 142, 178.) Defendant contends, however, that because his claim involves an important issue or substantial right, his failure to object is not fatal. He claims the error here is a hybrid one and is properly before the court: error from the jury instructions to which an objection is generally not required, coupled with the argument of counsel where an objection generally is required.

Even assuming the issue were cognizable, we find no reversible error here. As noted in *People v. Mayfield*, *supra*, 5 Cal.4th at page 179, "[t]he court's instructions, not the prosecution's argument, are determinative, for 'we presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' (*People v. Clair* [(1992)] 2 Cal.4th [629,] 663, fn. 8.)"

Here, the trial court properly instructed the jury. The jury was advised in CALCRIM No. 200, inter alia, that if it believed "that the attorneys' comments on the law conflict with [the trial court's] instructions, [it] must follow [the] instructions." With regard to the general principles of homicide, the jury was instructed with CALCRIM No. 500, including the principle that "[s]elf-defense is not a defense to felony murder." Next, the jury was instructed with CALCRIM No. 548 that provided, in relevant part, that "[e]ach theory of first degree murder has different requirements," drawing the jury's attention to the differences between felony murder and lying-in-wait murder. And in CALCRIM No. 520, the jury was expressly advised that murder with malice aforethought did "not apply to felony murder."

Also read to the jury were instructions regarding self defense. CALCRIM No. 505 (Justifiable Homicide: Self-Defense) expressly provided, in part, that the "instruction does not apply to felony murder. Self-defense is not a defense to felony murder." The jury was also instructed with CALCRIM No. 571 regarding imperfect self-defense. The instruction clarified that it did "not apply to felony murder. Imperfect self-defense does

39.

not apply to felony murder." CALCRIM No. 540A also provided that "[s]elf-defense is not a defense to felony murder."

Despite defendant's assertions to the contrary, the prosecutor's brief comment did not serve to confuse the jury. In context, the prosecutor was not arguing that there could be no defenses to lying-in-wait murder, such as self-defense. Instead, a fair reading of the argument is that in this case, defendant presented no defenses to lying in wait. The prosecutor pointed out that the evidence of lying in wait came from defendant's own mouth. The prosecutor characterized defendant's defense as "a confession." The prosecutor argued that defendant only presented defenses to second degree murder—but not to lying-in-wait murder, which is first degree murder.

In any event, the jury was expressly instructed that attorney comments regarding the law were to be disregarded if those comments differed from the law as instructed by the trial court. Thus, even assuming the jury understood the prosecutor's comment to mean that self-defense did not apply to lying-in-wait murder, the instructions read and provided to the jury advised otherwise. The jury was repeatedly advised that self-defense did not apply to *felony murder*; it was never instructed that self-defense was unavailable to a charge of first degree murder on a lying-in-wait theory.

Further, the jury was repeatedly advised that the People were putting forth two theories of first degree murder—felony murder and murder by lying in wait—and that different rules applied to each. The jury found the special circumstance pertaining to felony murder to be *not* true. Thus, it is clear the jury found defendant guilty of first degree murder on a lying-in-wait theory. Because the instructions pertaining to self-defense were given where two theories were proffered—and the jury rejected the one to which self-defense did *not* apply—it is reasonable to conclude the jury did not believe defendant's claims regarding the need of self-defense. To be sure, the evidence established that Jose was surprised by the presence of Perez and defendant in his home (no lights were on when Jose arrived home at 10:00 p.m., no unfamiliar cars were parked in front of or near his home, and Perez and defendant had concealed themselves in a

bedroom in Jose's dark trailer) and that Jose was attacked from behind by defendant who put him in a chokehold and then, once Jose was unconscious, tied him up.

In his reply brief, defendant cites to *Brown v. Payton* (2005) 544 U.S. 133, 146, in support of his argument that an otherwise proper jury instruction can be unclear to the degree it creates an unconstitutional denial of a defense or shifts the burden of proof. However, *Brown* is plainly distinguishable. The instructions given here do not involve a "catchall instruction" pertaining to death penalty mitigation such as that at issue in *Brown*.

In sum, in light of the instructions given here, we discern no reasonable likelihood that the prosecutor's statements would have misled the jury; therefore, defendant has failed to demonstrate any prejudice and reversal is not warranted.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
POOCHIGIAN, J.

41.